1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Marc E. Dann (*pro hac vice* anticipated)
Brian D. Flick (*pro hac vice* anticipated)
**DannLaw**
15000 Madison Avenue
Lakewood, OH 44107
Telephone: (216) 373-0539
Emails: mdann@dannlaw.com; notices@dannlaw.com

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
Sharon A. Harris (*pro hac vice* anticipated)
**Zimmerman Law Offices, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Email: firm@attorneyzim.com

Robert D. Mitchell, Arizona Bar No. 011922
Christopher J. Waznik, Arizona Bar No. 032812
Anne P. Barber, Arizona Bar No. 035591
CM Matthew Luk, Arizona Bar No. 037238

**TB** **TIFFANY & BOSCO**
P.A.

Camelback Esplanade II, Seventh Floor
2525 East Camelback Road
Phoenix, Arizona 85016
Telephone (602) 255-6000
E-mails:  rdm@tblaw.com; cjw@tblaw.com; apb@tblaw.com;
cml@tblaw.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sandra Brown, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>U-Haul International, Inc.,<br><br>        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>(DEMAND FOR JURY TRIAL) |

1

Plaintiff SANDRA BROWN ("Plaintiff"), individually and on behalf of all others similarly situated ("Plaintiff"), through her attorneys, brings this action against Defendant U-HAUL INTERNATIONAL, INC ("Defendant" or "U-Haul"), and alleges upon personal knowledge as to her own actions and experiences, and upon investigation, information, and belief as to all other matters, as follows:

## INTRODUCTION

1.      This consumer data breach lawsuit arises out of Defendant's failure to implement and maintain adequate security and safeguards with respect to its collection and maintenance of highly sensitive and confidential personal information of its customers, including names, dates of birth, and driver's license or state identification numbers (the "PII"). Defendant's insufficient and unreasonable data security practices caused, facilitated, and exacerbated the data breach and its impact on Plaintiff and Class members.

2.      U-Haul is an American moving truck, trailer, and self-storage rental company, based in Phoenix, Arizona, that has been in operation since 1945.[1] U-Haul has a network of locations across the United States.

3.      By Defendant's own admission, from at least November 5, 2021 to April 5, 2022, an unauthorized person obtained access to Defendant's customer contract search tool and customer rental contracts (the "Data Breach"). Although Defendant identified the incident as early as August 1, 2022, Defendant did not warn those most at risk—Plaintiff and Class members, until September 9, 2022.

---

[1] *See* https://www.uhaul.com/About/History/ (last visited Sept. 19, 2022).

2

4.      On or about September 9, 2022, Defendant notified the Security Exchange Commission of the Data Breach.

5.      The Data Breach exposed Plaintiff's and Class members' highly personally identifiable information ("PII") to criminals, including, but not limited to, name, date of birth, and driver's license number or state identification number.

6.      The PII that Defendant compromised, exposed, and criminals stole in the Data Breach consists of some of the most sensitive and damaging information when in the hands of criminals, including but not limited to: names, dates of birth, and driver's license or state identification numbers.

7.      The PII stolen in the Data Breach can be used by criminals alone, and in conjunction with other pieces of information, to perpetrate crimes against Plaintiff and Class members that can result in significant liability and damage to their money, property, creditworthiness, reputation, and their ability to pay current loans, improve their credit, and/or obtain loans on favorable terms in the future.

8.      Plaintiff and Class members entrusted Defendant with their sensitive PII. Defendant understands the importance of protecting such information. For example, on its website and in written documents provided to Plaintiff and Class members, Defendant states:

> We value our customers and their privacy. We never sell your personal information. This Privacy Policy covers entities within the U-Haul System ("We", "Us", "Our"). For purposes of this Privacy Policy, the U-Haul System shall be defined as: U-Haul International, Inc. ("U-Haul"), and its parent, affiliated entities, related companies, subsidiaries, and agents who operate the U-Haul System, pursuant to which, among other things, Rental Equipment, self-storage rooms, and U-Boxes® are provided to the public, various services are

rendered and products are sold. . . . . Your privacy is important to us, and we believe it is important to share with you how We handle your information, and how you can control the collection, correction and/or deletion of information. We will not use or share your information with anyone except as described in this Privacy Policy. . . . We use commercially reasonable physical, managerial, and technical safeguards to preserve the integrity and security of your Information and our systems. . . . . In the event that personal information is compromised as a result of a breach of security, We will promptly notify those persons whose personal information has been compromised, in accordance with the notification procedures set forth in this Privacy Policy, or as otherwise required by applicable law.

*See* https://www.uhaul.com/Legal/PrivacyPolicy/ (last visited Sept. 19, 2022.

9.      Defendant's representations concerning privacy practices and data security were false. Defendant does not state the date that it began investigating the incident, only that on August 1, 2022, its investigation determined that some rental contracts were accessed between November 5, 2021 and April 5, 2022. Criminals breached Defendant's inadequately defended systems, and accessed and acquired electronic files containing the PII of Plaintiff and Class members. The criminals gained unauthorized access by thwarting, circumventing, and defeating Defendant's unreasonably deficient data security measures and protocols. Defendants did not start notifying Plaintiff and other Class members of the Data Breach until on or around September 9, 2022.

10.      Plaintiff, individually, and on behalf of all persons similarly situated, seeks to be made whole for the losses incurred by Plaintiff and other victims of the Data Breach, and the losses that will be incurred in the future. Plaintiff also seek injunctive relief in the form of compliant data security practices, full disclosure regarding the disposition of the information in Defendant's systems, and monitoring and audits of

Defendant's security practices going forward because Defendant continues to collect, maintain, and store Plaintiff's and Class members' PII.

## PARTIES, JURISDICTION, AND VENUE

11.    Plaintiff is a citizen of Ohio.

12.    Defendant is a Nevada corporation with its principal place of business in Phoenix, Arizona.

13.    The Court has original jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a Class action involving 100 or more Class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Many members of the Class, including Plaintiff, are citizens of different states from Defendant.

14.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2), as a substantial part of the events giving rise to the claims emanated from activities within this District, and Defendant conducts substantial business in this District.

## GENERAL ALLEGATIONS

### *The Data Breach*

15.    In its September 9, 2022 notice to Plaintiff and Class members ("Data Breach Notice"), Defendant states that an unauthorized person obtained access to Defendant's file storage servers containing the PII of Plaintiff and Class members. A true and correct copy of the Data Breach Notice sent to Plaintiff is attached as **Exhibit 1**.

16.    Information pertaining to Plaintiff's and Class members' contracts with Defendant was acquired by an unauthorized person in the Data Breach.

5

17.     Defendant states that Plaintiff's and Class members' names, dates of birth, and driver's license or state identification numbers (the "PII"), provided in connection with contracts with Defendant, were accessed by unauthorized persons in the Data Breach. *See* **Exhibit 1**; *see also* U-Haul's SEC Form 8-K Report dated Sept. 9, 2022. Defendant omitted from its Data Breach Notice that Plaintiff's and Class members' birth dates were also taken by criminals in the Data Breach, but Defendant admitted that their birth dates were taken in its SEC Form 8-K Report.

18.     Since discovering the Data Breach, Defendant states that it is augmenting its security measures to guard against such incidents, and implementing additional security safeguards and controls on the search tool. *See* **Exhibit 1**. These are actions that should have been employed in the first place and they would have prevented or limited the impact of the Data Breach.

19.     Defendant discovered the Data Breach on or before August 1, 2022 but did not publicly announced the Data Breach and notify those who were placed at risk of identity theft, until September 9, 2022. Defendant waited over a month to send Data Breach Notices to persons whose PII was accessed by criminals in the Data Breach.

20.     In the Data Breach Notice, Defendant provided information to Plaintiff and Class members about additional steps they can take to help protect themselves, including obtaining credit monitoring and identity theft protection services to help them detect possible misuse of PII. *See* **Exhibit 1**.

21.     As a result of the Data Breach, Plaintiff and Class members have been and must continue to be vigilant and review their credit reports for incidents of identity theft,

and educate themselves about security freezes, fraud alerts, and other steps to protect themselves against identity theft. Defendant's Data Breach Notice also advises Plaintiff and Class members to do all of this.

### *Industry Standards for Data Security*

22.    Defendant is aware of the importance of safeguarding Plaintiff's and Class members' PII, that by virtue of its business it places Plaintiff's and Class members' PII at risk of being targeted by hackers.

23.    Defendant is aware that the PII that it collects, organizes, and stores, can be used by criminals to engage in crimes such as identity fraud and theft using Plaintiff's and Class members' PII.

24.    Because of Defendant's failure to implement, maintain, and comply with necessary cybersecurity requirements, Defendant was unable to protect Plaintiff's and Class members' information and confidentiality, and protect against obvious and readily foreseeable threats to information security and confidentiality. As a proximate result of such failures, criminals gained unauthorized access to Defendant's customer contract search tool for a period of approximately five (5) months, and acquired Plaintiff's and Class members' PII in the Data Breach without being stopped.

25.    Only after the attack was completed did Defendant begin to undertake basic steps recognized in the industry to protect Plaintiff's and Class members' PII.

26.    Defendant was unable to prevent the Data Breach, and was unable to detect the unauthorized access to vast quantities of sensitive and protected files containing protected information of Plaintiff and Class members for five (5) months. Discovery on

Defendant, law enforcement investigators, and private investigators, will reveal more specific facts about Defendant's deficient and unreasonable security procedures.

27.    Security standards commonly accepted among businesses that store personal information using the Internet include, without limitation:

    a)    Maintaining a secure firewall configuration;

    b)    Monitoring for suspicious or irregular traffic to servers;

    c)    Monitoring for suspicious credentials used to access servers;

    d)    Monitoring for suspicious or irregular activity by known users;

    e)    Monitoring for suspicious or unknown users;

    f)    Monitoring for suspicious or irregular server requests;

    g)    Monitoring for server requests for personal information;

    h)    Monitoring for server requests from VPNs; and

    i)    Monitoring for server requests from Tor exit nodes.

28.    The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[2] and protection of personal information[3] which includes basic security standards applicable to all types of businesses.

29.    The FTC recommends that businesses:

    a)    Identify all connections to the computers where you store sensitive information;

---

[2]    *See* F.T.C., *Start with Security: A Guide for Business*, (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Sept. 20, 2022).

[3]    *See* F.T.C., *Protecting Personal Information: A Guide for Business*, (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sept. 20, 2022).

b)    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c)    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d)    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e)    Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f)    Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g)    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h)    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i)    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

30.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[4]

31.     Because Defendant was entrusted with consumers' PII, it had and has a duty to keep the PII secure.

32.     Plaintiff and Class members reasonably expect that when they provide their PII to a company, the company will safeguard their PII.

33.     Despite Defendant's obligations, Defendant failed to upgrade and maintain its data security systems in a meaningful way so as to prevent the Data Breach.

34.     Specifically, in breach of its duties, Defendant failed to:

a)      Replace email filtering tools, malware software, and Internet monitoring tools with more robust solutions that utilize artificial intelligence ("AI") to detect and block known and newly introduced malware;

b)      Block all inbound and outbound Internet, email, and network traffic to foreign countries;

c)      Maintain a secure firewall configuration;

d)      Monitor for suspicious or irregular traffic to servers;

---

[4] F.T.C., *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Sept. 20, 2022).

e) Monitor for suspicious credentials used to access servers;

f) Monitor for suspicious or irregular activity by known users;

g) Monitor for suspicious or unknown users;

h) Monitor for suspicious or irregular server requests;

i) Monitor for server requests for personal information;

j) Monitor for server requests from VPNs;

k) Monitor for server requests from Tor exit nodes;

l) Identify all connections to the computers where Defendant stores sensitive information;

m) Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

n) Scan computers on Defendant's network to identify and profile the operating system and open network services, and disable services that are not needed to prevent hacks or other potential security problems;

o) Pay particular attention to the security of Defendant's web applications—the software used to give information to visitors to its websites and to retrieve information from them;

p) Use a firewall to protect Defendant's computers from hacker attacks while they are connected to a network, especially the Internet;

q) Not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting its business;

r) Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

s)    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

t)    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

35.    Had Defendant properly maintained its systems and adequately protected them, it could have prevented the Data Breach.

### Defendant Owed Duties to Plaintiff and Class Members to Adequately Secure and Safeguard Their PII

36.    Defendant is aware of the importance of security in maintaining personal information (particularly sensitive personal information), and the value consumers place on keeping their PII secure.

37.    Defendant owes duties to Plaintiff and the Class members to maintain adequate security and safeguards to protect the confidentiality of their PII.

38.    Defendant owes a further duty to its customers to immediately and accurately notify them of a breach of its systems to protect them from identity theft and other misuse of their personal data and to take adequate measures to prevent further breaches.

### The Categories of PII at Issue Here Are Particularly Valuable to Criminals

39.    Businesses that solicit, aggregate, and store sensitive PII are likely to be targeted by cyber criminals.

40.    The FTC has released its updated publication on protecting PII for

businesses, which includes instructions on protecting PII, properly disposing of PII, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

41.    The FTC has, upon information and belief, brought enforcement actions against businesses for failing to protect PII. The FTC has done this by treating a failure to employ reasonable measures to protect against unauthorized access to PII as a violation of the FTC Act, 15 U.S.C. § 45.

42.    General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for *years*. According to a U.S. Government Accountability Office report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[5]

43.    Companies recognize that PII is a valuable asset. Indeed, PII is a valuable commodity. A "cyber black-market" exists in which criminals openly post PII on a number of Internet websites. Plaintiff's and Class members' personal data that was stolen has a high value on both legitimate and black markets.

44.    At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information

---

[5] *See* https://www.gao.gov/assets/gao-07-737.pdf at 29 (last visited Sept. 20, 2022).

aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[6]

45.    Individuals rightfully place a high value not only on their PII, but also on the privacy of that data. Researchers have already begun to shed light on how much individuals value their data privacy—and the amount is considerable.

46.    Notably, one study on website privacy determined that U.S. consumers valued the restriction of improper access to their personal information—the very injury at issue here—between $11.33 and $16.58 per website.[7]   The study also determined that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US$30.49 – 44.62."[8] This study was done in 2002. The sea-change in how pervasive the Internet is in everyday lives since then indicates that these values—when associated with the loss of PII to bad actors—would be exponentially higher today.

47.    Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts

---

[6] FEDERAL TRADE COMMISSION, *The Information Marketplace: Merging and Exchanging Consumer Data*, transcript, p. 8, *available* at http://www.ftc.gov/news-events/events-calendar/2001/03/information-marketplace-merging-exchanging-consumer-data (last visited Sept. 20. 2022).

[7] Hann, Hui, *et al*, The Value of Online Information Privacy: Evidence from the USA and Singapore, at p. 17. Oct. 2002, available at https://www.comp.nus.edu.sg/~ipng/research/privacy. pdf (last visited Sept. 20. 2022).

[8] *Id.*

acknowledge that it may take years for identity theft to come to light and be detected.

48.    To date, Defendant has offered Plaintiff and Class members only one year of credit monitoring and identity theft detection services. The offered service is wholly inadequate to protect Plaintiff and Class members from the threats they face for years to come, particularly in light of the PII at issue here, and is not an adequate cure of the Data Breach.

49.    The information Defendant allowed to be compromised and taken is of such that the harms to Plaintiff and the Class will continue to grow, and Plaintiff and Class members will continue to be at substantial risk for further imminent and future harm.

***Damages from Data Breaches***

50.    According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.

51.    Consumers place a high value not only on their personal information, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

52.    The United States Government Accountability Office explains that "[t]he term 'identity theft' is broad and encompasses many types of criminal activities, including fraud on existing accounts—such as unauthorized use of a stolen credit card number—or fraudulent creation of new accounts—such as using stolen data to open a credit card account in someone else's name." *See In re Zappos.com, Inc.*, 888 F.3d 1020,

1024 (9th Cir. 2018). The GAO Report notes that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

53.    The FTC recommends that identity theft victims take several steps to protect their personal information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports often, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

54.    Identity thieves use stolen personal information for "various types of criminal activities, such as when personal and financial is used to commit fraud or other crimes," including "credit card fraud, phone or utilities fraud, bank fraud and government fraud." *In re Zappos.com, Inc.*, 888 F.3d at 1024. The information exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiff and Class members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are which are ways for hackers to exploit information they already have to get even more personally identifying information through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

55.    There may be a time lag between when harm occurs versus when it is discovered, and also between when personal information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

56.     Personal information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber blackmarket" for years.

57.     Thus, there is a strong probability that entire batches of stolen information have been dumped on the black market, or are yet to be dumped on the black market, meaning Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future.

58.     Data breaches are preventable. As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."

59.     "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."

60.    Indeed, here Defendant deployed enhanced security measures after the Data Breach, but should have implemented them to prevent the Data Breach.

61.    The types of information Defendant acknowledges were stolen by the criminals are sufficiently sensitive and valuable to identity thieves and criminals in perpetrating identity crimes. Defendant states that Plaintiff's and Class members' names, dates of birth, and driver's license or state identification numbers were taken in the Data Breach. This information can be used to perpetrate scams, victimize the persons who own the information, and commit identity theft and fraud.[9]

62.    A person's driver's license or state identification numbers can be used alone or in conjunction with other pieces of information to commit serious fraud. *See* https://www.aura.com/learn/can-someone-steal-your-identity-with-your-id (last visited Sept. 19, 2022).  For example, a driver's license number can be (a) sold on the Dark Web, (b) used to commit driver's license fraud, (c) used to create fake IDs using the stolen driver's license or identification number, (d) used to create synthetic identities, (e) used to commit identity theft, and (f) used to commit mail fraud. *Id.*

63.    Criminals can use the information to devise and employ phishing and social engineering schemes capitalizing on the genuine information stolen from Defendant to send fraudulent mail and other communications to Plaintiff and Class members that look authentic, but which are designed to lure them into paying money or providing other information that the criminals can use to steal money.

---

[9] *See* https://www.aura.com/learn/can-someone-steal-your-identity-with-your-id (last visited Sept. 19, 2022).

64.     It is recommended that if your driver's license numbers is stolen, you should request a copy of your official driving record from the motor vehicles department and do it again at a later date.[10] Thieves may create a fake license using the stolen driver's license number and present it as identification during a traffic stop.[11]

65.     It is also recommended that if your driver's license or identification number is stolen, you should run a background check on yourself to see if there are any criminal convictions or arrest warrants that do not apply to you because these are a sign that someone has been using your identity. *Id.*

### Plaintiff Received Defendant's Data Breach Notification Letter

66.     In 2022, Plaintiff entered into a rental contract with U-Haul in Hamilton, Ohio, for a box truck, which she needed to move some large items.

67.     Plaintiff and Class members provided Defendant with significant personal information, including their names and birth dates, in conjunction with their driver's license and identification numbers.

68.     Plaintiff provided Defendant with her driver's license for review when she entered into the rental contract for the box truck.

69.     Defendant has admitted that this information relating to Plaintiff and Class members was exposed, compromised, accessed, viewed without authorization, and stolen in the Data Breach by criminals.

---

[10] *See* https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/ (last visited Sept. 19, 2022).
[11] *Id.*

70.    On or about September 9, 2022, Defendant sent the Data Breach Notice by email notifying Plaintiff and Class members that PII—including their names, and driver's license and identification numbers—was taken by an "unauthorized person" in the Data Breach. *See* **Exhibit 1**. Defendant omitted from its Data Breach Notice that Plaintiff's and Class members' birth dates were also taken by criminals in the Data Breach, but Defendant admitted that their birth dates were taken in its SEC Form 8-K Report.

### *Plaintiff's and Class Members' Damages*

71.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

72.    Plaintiff and Class members have or will suffer actual injury as a direct result of the Data Breach including:

a)    Spending time reviewing charges for any fraudulent charges and remedying any fraudulent charges found;

b)    Purchasing credit monitoring and identity theft prevention;

c)    Requesting their official driving record from the motor vehicles department and reviewing it for reports of traffic stops unrelated to themselves;

d)    Running a background check on themselves to see if there are any criminal convictions or arrest warrants that don't apply to them;

e)    Time and money addressing and remedying identity theft;

f)    Spending time placing "freezes" and "alerts" with credit reporting agencies and, subsequently, temporarily lifting a security freeze on a credit report, or removing a security freeze from a credit report;

g)    Spending time on the phone with or visiting financial institutions to dispute fraudulent charges;

h)    Contacting their financial institutions and closing or modifying financial accounts compromised as a result of the Data Breach; and

i)    Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

73.    Moreover, Plaintiff and the Class members have an interest in ensuring that their personal information is protected from further breaches by the implementation of security measures and safeguards, including making sure that the storage of data containing their personal information is secure.

74.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class members have suffered anxiety, emotional distress, and loss of privacy.

75.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class members are at an increased and immediate risk of future harm, including from identity theft and fraud.

76.    As a result of the Data Breach, Plaintiff and Class members are at an imminent risk of identity theft and fraud. This risk will continue to exist for years to come, as Plaintiff and Class members must spend their time being extra vigilant, due to Defendant's failures, to try to prevent being victimized for the rest of their lives.

77.    Because Defendant presented such an easy target to cyber criminals, Plaintiff and Class members have already been subjected to violations of their privacy, and have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class members must now and in the future, spend time to more closely monitor their affected PII to guard against identity theft and other fraud.

78.    Plaintiff and Class members may also incur out-of-pocket costs for, among

other things, purchasing credit monitoring services or other protective measures (such as obtaining their official traffic record and running a background check) to deter and detect identity theft.

## **CLASS ACTION ALLEGATIONS**

79.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a class of similarly situated individuals (the "Class") defined as follows:

> All individuals in the United States whose personally identifiable information was accessed in the Data Breach announced by U-Haul International, Inc.

80.    Excluded from the Class are Defendant; any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the judges and court personnel in this case and any members of their immediate families.

81.    Plaintiff reserves the right to modify and/or amend the Class definition, including but not limited to creating subclasses, as necessary.

82.    ***Numerosity***. The Class is so numerous that joinder of all members is impracticable. The identities of all Class members are ascertainable through Defendant's records.

83.    ***Commonality***. There are numerous questions of law and fact common to Plaintiff and the Class, including the following:

- Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class members;
- Whether Defendant had a duty not to disclose the PII of Plaintiff and

22

Class members to unauthorized third parties;

• Whether Defendant had a duty not to use the PII of Plaintiff and Class members for non-business purposes;

• Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class members;

• When Defendant actually learned of the Data Breach;

• Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class members that their PII had been compromised;

• Whether Defendant violated the law by failing to promptly notify Plaintiff and Class members that their PII had been compromised;

• Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

• Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

• Whether Defendant violated the Drivers Privacy Protection Act by failing to adequately safeguard and protect the PII of Plaintiff and Class members thereby allowing the PII to be used for an impermissible purpose;

• Whether Plaintiff and Class members are entitled to actual damages, statutory damages, nominal damages, and/or exemplary damages as a result of Defendant's wrongful conduct;

• Whether Plaintiff and Class members are entitled to restitution as a result of Defendant's wrongful conduct; and

• Whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

84. ***Typicality***. Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all Class members, had her PII compromised, breached and stolen in the Data Breach. Plaintiff and Class members were injured through Defendant's uniform misconduct described in this Complaint and assert the same claims for relief.

85.     *Adequacy*. Plaintiff and her counsel will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are experienced in class actions and complex litigation, including data privacy litigation of this kind. Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of other members of the Class.

86.     *Predominance*. The questions of law and fact common to Class members predominate over any questions which may affect only individual members.

87.     *Superiority*. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most Class members would find the cost of litigating their claims prohibitively high and would therefore have no effective remedy, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Plaintiff and Class members have been harmed by Defendant's wrongful conduct and/or action.

88.     Litigating this action as a class action will reduce the possibility of repetitious litigation relating to Defendant's conduct and/or inaction. No difficulties would be encountered in this litigation that would preclude its maintenance as a class action.

89.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3), because the above common questions of law or fact predominate over any questions

24

affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

90.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2), because Defendant has acted or refused to act on grounds that apply generally to the Classes so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I
### Negligence
### *(On behalf of Plaintiff and the Class)*

91.    Plaintiff repeats and realleges the allegations of the paragraphs 1-90 with the same force and effect as though fully set forth herein.

92.    Defendant's actions and inactions were of the type that would result in foreseeable, unreasonable risk of harm to Plaintiff and Class members. Defendant knew, or should have known, of the risks inherent in collecting and storing the personal information of Plaintiff and Class members and the importance of adequate security in storing the information. Additionally, Defendant is aware of numerous, well-publicized data breaches that exposed the personal information of individuals.

93.    Defendant had a common law duty to prevent foreseeable harm to Plaintiff's and Class members' PII. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of the failure of Defendant to adopt, implement, and maintain reasonable security measures so that Plaintiff's and Class members' personal information would not be unsecured and accessible by unauthorized persons.

94.    Defendant had a special relationship with Plaintiff and Class members. Defendant was entrusted with Plaintiff's and Class members' personal information, and Defendant was in a position to protect the personal information from unauthorized access.

95.    The duties of Defendant also arose under section 5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect individuals' personal information by companies. Various FTC publications and data security breach orders further form the basis of the duties of Defendant.

96.    Defendant had a duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Plaintiff's and Class members' personal information in its possession so that the personal information would not come within the possession, access, or control of unauthorized persons.

97.    More specifically, the duties of Defendant included, among other things, the following duties, and Defendant carelessly and negligently acted or failed to act in one or more of the following ways:

- Failing to conduct proper and reasonable due diligence over its data security systems, practices, and procedures;

- Failing to adopt, implement, and maintain adequate security measures for protecting an individual's personal information to ensure that the information is not accessible online by unauthorized persons;

- Failing to adopt, implement, and maintain adequate security measures for deleting or destroying personal information when Defendant's business needs no longer required such information to be stored and maintained; and

- Failing to adopt, implement, and maintain processes to quickly detect a data breach and to promptly act on warnings about data breaches, and notify affected persons without unreasonable delay.

98.    Defendant breached the foregoing duties to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting personal information in its possession so that the information would not come within the possession, access, or control of unauthorized persons.

99.    Defendant acted with reckless disregard for the security of the personal information of Plaintiff and Class members because Defendant knew or should have known that its data security was not adequate to safeguard the personal information that was collected and stored.

100.    Defendant acted with reckless disregard for the rights of Plaintiff and the Class members by failing to promptly detect the Data Breach, and further, by failing to notify Plaintiff and the Class members of the Data Breach in the most expedient time possible and without unreasonable delay pursuant to common law duties to provide reasonably timely and truthful data-breach notification, so that Plaintiff and Class members could promptly take measures to protect themselves from the consequences of the unauthorized access to the personal information compromised in the Data Breach.

101.    As a result of the conduct of Defendant, Plaintiff and Class members have suffered and will continue to suffer foreseeable harm. Plaintiff and Class members have suffered actual damages including, but not limited to, imminent risk of identity theft; expenses and/or time spent on credit monitoring for a period of years; time spent

obtaining and reviewing background checks to see if there are any criminal convictions or arrest warrants that do not apply to themselves; time spent obtaining official driving records from the motor vehicles department to review and see if there are any reports of traffic stops that do not apply to themselves; scrutinizing bank statements, credit card statements, and credit reports; time spent initiating fraud alerts and credit freezes and subsequently temporarily lifting credit freezes; and increased risk of future harm. Further, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

### COUNT II
**Negligence Per Se**
***(On Behalf of Plaintiff and the Class)***

102.    Plaintiff repeats and realleges the allegations of paragraphs 1-90 with the same force and effect as though fully set forth herein.

103.    "Section 5 of the FTC Act [15 U.S.C. § 45] is a statute that creates enforceable duties, and this duty is ascertainable as it relates to data breach cases based on the text of the statute and a body of precedent interpreting the statute and applying it to the data beach context." *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020). "For example, in *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240 (3d Cir. 2015), the United States Court of Appeals for the Third Circuit affirmed the FTC's enforcement of Section 5 of the FTC Act in data breach cases." *Capital One Data Security Breach Litigation*, 488 F. Supp. 3d at 407.

104.    Plaintiff's and Class members' PII was and is nonpublic personal

information and customer information.

105.    Plaintiff and Class members are in the group of persons the FTC Act was enacted and implemented to protect, and the harms they suffered in the Data Breach as a result of Defendant's violations of the FTC Act were the types of harm they were designed to prevent.

106.    As a result of the conduct of Defendant that violated the FTC Act, Plaintiff and Class members have suffered and will continue to suffer foreseeable harm. Plaintiff and Class members have suffered actual damages including, but not limited to, imminent risk of identity theft; expenses and/or time spent on credit monitoring for a period of years; time spent obtaining and reviewing background checks to see if there are any criminal convictions or arrest warrants that do not apply to themselves; time spent obtaining official driving records from the motor vehicles department to see if there are any reports of traffic stops that do not apply to themselves; scrutinizing bank statements, credit card statements, and credit reports; time spent initiating fraud alerts and credit freezes and subsequently temporarily lifting credit freezes; and increased risk of future harm. Further, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## COUNT III
### Breach of Implied Contract
### *(On Behalf of Plaintiff and the Class)*

107.    Plaintiff repeats and realleges the allegations of paragraphs 1-90 with the same force and effect as though fully set forth herein.

108. Defendant acquired and maintained the PII of Plaintiff and Class members.

109. At the time Defendant acquired the PII of Plaintiff and Class members, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the PII using reasonable security measures and not take unjustified risks when collecting, digitizing, and storing the PII.

110. Plaintiff and Class members would not have entrusted their PII to Defendant had they known that Defendant would make the PII vulnerable and fail to take reasonable precautions, such as encrypting the data while in storage, and deleting PII that was no longer necessary.

111. Defendant promised to comply with industry standards and to ensure that Plaintiff's and Class members' PII would remain protected.

112. Implicit in the agreements between Plaintiff and Class members and Defendant to provide PII was Defendant's obligation to:

- Use the PII for business purposes only;

- Take reasonable steps to protect and safeguard the PII from known and foreseeable risks;

- Prevent unauthorized disclosures of the PII;

- Provide Plaintiff and Class members with prompt and sufficient notice of instances where unauthorized access to the PII is reasonably suspected; and

- Reasonably safeguard and protect the PII of Plaintiff and Class members from unauthorized disclosures or uses.

113.    In collecting and maintaining the PII of Plaintiff and Class members and publishing and disseminating privacy notices, Defendant entered into contracts to protect and keep security over the PII of Plaintiff and Class members.

114.    Plaintiff and Class members fully performed under their contract with Defendant.

115.    Defendant breached the contracts by failing to protect and keep private the personal information of Plaintiff and Class members, including by failing to: (i) encrypt or tokenize the sensitive PII of Plaintiff and Class members, (ii) delete such PII that Defendant no longer had reason to maintain, (iii) eliminate the potential accessibility of the PII from the Internet where such accessibility was not justified, and (iv) otherwise review and improve the security of the network system that contained such PII.

116.    Defendant also breached a duty to provide reasonably expedient and sufficient notification of the Data Breach.

117.    As a result of Defendant's breach of implied contract, Plaintiff and Class members have suffered and will continue to suffer foreseeable harm. Plaintiff and Class members have suffered actual damages including, but not limited to, imminent risk of identity theft; expenses and/or time spent on credit monitoring for a period of years; time spent obtaining and reviewing background checks to see if there are any criminal convictions or arrest warrants that do not apply to themselves; time spent obtaining official driving records from the motor vehicles department to see if there are any reports of traffic stops that do not apply to themselves; scrutinizing bank statements, credit card statements, and credit reports; time spent initiating fraud alerts and credit freezes and

subsequently temporarily lifting credit freezes; and increased risk of future harm. Further, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## COUNT IV

**Violations of the Drivers Privacy Protection Act, 18 U.S.C. § 2721, *et seq.***
**(On Behalf of Plaintiff and the Class)**

118.   Plaintiff repeats and realleges the allegations of paragraphs 1-90 with the same force and effect as though fully set forth herein.

119.   A "'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." *See* 18 U.S.C. § 2725(1).

120.   "Personal information" means "information that identifies an individual", including, but not limited to, an individual's driver's identification number. *See* 18 U.S.C. § 2725(3).

121.   Defendant knowingly obtained Plaintiff's and Class members' personal information from a motor vehicle record, including their names and driver's license or state identification numbers.

122.   Defendant populated its customer contract search tool with Plaintiff's and Class members' personal information, including their driver's license or state identification numbers.

123.   Defendant reasonably should have known that populating its customer contract search tool with Plaintiff's and Class members' driver's license and

identification numbers without adequate security and safeguards would result in disclosure of the personal information to cybercriminals for impermissible purposes.

124.    Because Defendant failed to implement adequate security and safeguards to prevent the Data Breach, Plaintiff's and Class members' driver's license and identification numbers were disclosed to cybercriminals for impermissible purposes.

125.    Plaintiff and each Class member demands actual damages, but not less than liquidated damages in the amount of $2,500, punitive damages upon proof of willful or reckless disregard of the law, reasonable attorney's fees and other litigation costs reasonably incurred, and such other preliminary and equitable relief as the Court determines to be appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, individually and on behalf of the Class, requests that the Court:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as the Class representative, and appoint the undersigned counsel as Class counsel;

B.    Award declaratory, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class members;

C.    Award restitution and damages to Plaintiff and Class members in an amount to be determined at trial;

D.    Award Plaintiff and Class members their reasonable litigation expenses and attorneys' fees to the extent allowed by law;

E.    Award Plaintiff and Class members pre- and post-judgment interest, to the extent allowable; and

F.    Award such other and further relief as equity and justice may require.

1

## <u>DEMAND FOR JURY TRIAL</u>

2

3          Plaintiff demands a trial by jury of any and all issues in this action so triable of

4  right.

5          RESPECTFULLY SUBMITTED this 29th day of September, 2022.

6                                       Plaintiff SANDRA BROWN, individually and on
7                                       behalf of all others similarly situated,

8

9

10                                      By: _____
11                                          Marc E. Dann (*pro hac vice* anticipated)
                                            Brian D. Flick (*pro hac vice* anticipated)
12                                          **DannLaw**
                                            15000 Madison Avenue
13                                          Lakewood, OH 44107
                                            Emails: mdann@dannlaw.com;
14                                          notices@dannlaw.com
15
                                            Thomas A. Zimmerman, Jr. (*pro hac vice*
16                                          anticipated)
                                            Sharon A. Harris (*pro hac vice* anticipated)
17                                          **Zimmerman Law Offices, P.C.**
                                            77 W. Washington Street, Suite 1220
18                                          Chicago, Illinois 60602
                                            Email: firm@attorneyzim.com
19
20                                          Robert D. Mitchell
21                                          Christopher J. Waznik
                                            Anne P. Barber
22                                          CM Matthew Luk
23                                          **TB  TIFFANY & BOSCO**
                                                         P.A.
24
                                            Camelback Esplanade II, Seventh Floor
25                                          2525 East Camelback Road
                                            Phoenix, Arizona 85016
26                                          E-mails:  rdm@tblaw.com; cjw@tblaw.com;
                                            apb@tblaw.com; cml@tblaw.com
27                                          *Counsel for Plaintiff and the Class*
28

EXHIBIT 1

From: <notification@uhaul.com>
Date: Fri, Sep 9, 2022, 5:32 PM
Subject: Notice of Recent Security Incident
To: ████████████████████

**U-HAUL**   *Your moving and storage resource.*

Dear Sandra Brown:

We are writing to inform you of an incident that involved some of your information. We are providing this notice to explain the incident and measures we have taken, and also to provide some steps you can take in response.

**What Happened?**

We detected a compromise of two unique passwords that were used to access a customer contract search tool that allows access to rental contracts for U-Haul customers. The search tool cannot access payment card information; no credit card information was accessed or acquired. Upon identifying the compromised passwords, we promptly changed the passwords to prevent any further unauthorized access to the search tool and started an investigation. Cybersecurity experts were engaged to identify the contracts and data that were involved. The investigation determined an unauthorized person accessed the customer contract search tool and some customer contracts. None of our financial, payment processing or U-Haul email systems were involved; the access was limited to the customer contract search tool.

**What Information Was Involved?**

On August 1, 2022, our investigation determined some rental contracts were accessed between November 5, 2021, and April 5, 2022. After an in-depth analysis, our investigation determined on September 7, 2022, the accessed information includes your name and driver's license or state identification number.

**What Are We Doing?**

The safety and trust of our customers, including the protection of personal information, is a top priority for U-Haul Company and we take that responsibility very seriously. While the information accessed in this incident did not include payment card information, we fully understand this is an inconvenience to you. We sincerely apologize for that. Please know we are working diligently to further augment our security measures to guard against such incidents and implementing additional security safeguards and controls on the search tool.

1

EXHIBIT 1

Additionally, we are offering affected customers identity theft protection services through Equifax for one year. This product helps detect possible misuse of your personal information and provides you with identity protection services focused on immediate identification and resolution of identity theft. The service is completely free to you and enrolling in this program will not hurt your credit score.

**What You Can Do.**

For more information, including some additional steps you can take to help protect yourself, please see the additional information provided with this letter.

**For More Information.**

If you have any questions, please call 866-963-0620, Monday through Friday, 9:00 a.m. to 5:00 p.m. Mountain Time. This email account is not monitored. Please do not reply to this email.

Sincerely,
John "J.T." Taylor
President, U-Haul International, Inc.

# Identity Theft Protection Information

**Sandra Brown**
Enter your Activation Code: ███████████
Enrollment Deadline: **12/31/2022**

## Equifax Credit Watch™ Gold

\* Note: You must be over age 18 with a credit file to take advantage of the product

**Key Features**

- Credit monitoring with email notifications of key changes to your Equifax credit report
- Daily access to your Equifax credit report
- WebScan notifications[1] when your personal information, such as Social Security Number, credit/debit card or bank account numbers are found on fraudulent Internet trading sites
- Automatic fraud alerts[2], which encourages potential lenders to take extra steps to verify your identity before extending credit, plus blocked inquiry alerts and Equifax credit report lock[3]
- Identity Restoration to help restore your identity should you become a victim of identity theft, and a dedicated Identity Restoration Specialist to work on your behalf
- Up to $1,000,000 of identity theft insurance coverage for certain out of pocket expenses resulting from identity theft[4]

**Enrollment Instructions**

Go to www.equifax.com/activate

Enter your unique Activation Code of ▮▮▮▮▮▮ then click "Submit" and follow these 4 steps:

1. **Register:** Complete the form with your contact information and click "Continue".

   *If you already have a myEquifax account, click the "Sign in here" link under the "Let's get started" header. Once you have successfully signed in, you will skip to the Checkout Page in Step 4.*

2. **Create Account:** Enter your email address, create a password, and accept the terms of use.
3. **Verify Identity:** To enroll in your product, we will ask you to complete our identity verification process.
4. **Checkout:** Upon successful verification of your identity, you will see the Checkout Page. Click "Sign Me Up" to finish enrolling.

**You're done!** The confirmation page shows your completed enrollment. Click "View My Product" to access the product features.

[1] *WebScan searches for your Social Security Number, up to 5 passport numbers, up to 6 bank account numbers, up to 6 credit/debit card numbers, up to 6 email addresses, and up to 10 medical ID numbers. WebScan searches thousands of Internet sites where consumers' personal information is suspected of being bought and sold, and regularly adds new sites to the list of those it searches. However, the Internet addresses of these suspected Internet trading sites are not published and frequently change, so there is no guarantee that we are able to locate and search every possible Internet site where consumers' personal information is at risk of being traded* [2] *The Automatic Fraud Alert feature is made available to consumers by Equifax Information Services LLC and fulfilled on its behalf by Equifax Consumer Services LLC.* [3] *Locking your Equifax credit report will prevent access to it by certain third parties. Locking your Equifax credit report will not prevent access to your credit report at any other credit reporting agency. Entities that may still have access to your Equifax credit report include: companies like Equifax Global Consumer Solutions, which provide you with access to your credit report or credit score, or monitor your credit report as part of a subscription or similar service; companies that provide you with a copy of your credit report or credit score, upon your request; federal, state and local government agencies and courts in certain circumstances; companies using the information in connection with the underwriting of insurance, or for employment, tenant or background screening purposes; companies that have a current account or relationship with you, and collection agencies acting on behalf of those whom you owe; companies that authenticate a consumer's identity for purposes other than granting credit, or for investigating or preventing actual or potential fraud; and companies that wish to make pre-approved offers of credit or insurance to you. To opt out of such pre-approved offers, visit* www.optoutprescreen.com [4] *The Identity Theft Insurance benefit is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company, under group or blanket policies issued to Equifax, Inc., or its respective affiliates for the benefit of its Members. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.*

## Additional Steps You Can Take

We remind you it is always advisable to be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity. You may obtain a copy of your credit report, free of charge, once every 12 months from each of the three nationwide credit reporting companies. To order your annual free credit report, please visit www.annualcreditreport.com or call toll free at 1-877-322-8228. Contact information for the three nationwide credit reporting companies is as follows:

- *Equifax*, PO Box 740241, Atlanta, GA 30374, www.equifax.com, 1-800-685-1111
- *Experian*, PO Box 2002, Allen, TX 75013, www.experian.com, 1-888-397-3742
- *TransUnion*, PO Box 2000, Chester, PA 19016, www.transunion.com, 1-800-916-8800

If you believe you are the victim of identity theft or have reason to believe your personal information has been misused, you should immediately contact the Federal Trade Commission and/or the Attorney General's office in your state. You can obtain information from these sources about steps an individual can take to avoid identity theft as well as information about fraud alerts and security freezes. You should also contact your local

law enforcement authorities and file a police report. Obtain a copy of the police report in case you are asked to provide copies to creditors to correct your records. Contact information for the Federal Trade Commission is as follows:

- *Federal Trade Commission*, Consumer Response Center, 600 Pennsylvania Avenue NW, Washington, DC 20580, 1-877-IDTHEFT (438-4338), www.identitytheft.gov

**Fraud Alerts and Credit or Security Freezes:**

**Fraud Alerts:** There are two types of general fraud alerts you can place on your credit report to put your creditors on notice that you may be a victim of fraud—an initial alert and an extended alert. You may ask that an initial fraud alert be placed on your credit report if you suspect you have been, or are about to be, a victim of identity theft. An initial fraud alert stays on your credit report for one year. You may have an extended alert placed on your credit report if you have already been a victim of identity theft with the appropriate documentary proof. An extended fraud alert stays on your credit report for seven years.

To place a fraud alert on your credit reports, contact one of the nationwide credit bureaus. A fraud alert is free. The credit bureau you contact must tell the other two, and all three will place an alert on their versions of your report.

For those in the military who want to protect their credit while deployed, an Active Duty Military Fraud Alert lasts for one year and can be renewed for the length of your deployment. The credit bureaus will also take you off their marketing lists for pre-screened credit card offers for two years, unless you ask them not to

**Credit or Security Freezes:** You have the right to put a credit freeze, also known as a security freeze, on your credit file, free of charge, which makes it more difficult for identity thieves to open new accounts in your name. That's because most creditors need to see your credit report before they approve a new account. If they can't see your report, they may not extend the credit.

*How do I place a freeze on my credit reports?* There is no fee to place or lift a security freeze. Unlike a fraud alert, you must separately place a security freeze on your credit file at each credit reporting company. For information and instructions to place a security freeze, contact each of the credit reporting agencies at the addresses below:

- **Experian Security Freeze**, PO Box 9554, Allen, TX 75013, www.experian.com
- **TransUnion Security Freeze**, PO Box 2000, Chester, PA 19016, www.transunion.com
- **Equifax Security Freeze**, PO Box 105788, Atlanta, GA 30348, www.equifax.com

You'll need to supply your name, address, date of birth, Social Security number and other personal information.

After receiving your freeze request, each credit bureau will provide you with a unique PIN (personal identification number) or password. Keep the PIN or password in a safe place. You will need it if you choose to lift the freeze.

*How do I lift a freeze?* A freeze remains in place until you ask the credit bureau to temporarily lift it or remove it altogether. If the request is made online or by phone, a credit bureau must lift a freeze within one hour. If the

request is made by mail, then the bureau must lift the freeze no later than three business days after getting your request

If you opt for a temporary lift because you are applying for credit or a job, and you can find out which credit bureau the business will contact for your file, you can save some time by lifting the freeze only at that particular credit bureau. Otherwise, you need to make the request with all three credit bureaus.

**A Summary of Your Rights Under the Fair Credit Reporting Act:** The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Your major rights under the FCRA are summarized below. For more information, including information about additional rights, go to www.consumerfinance.gov/learnmore or write to: Consumer Financial Protection Bureau, 1700 G Street NW, Washington, DC 20552.

- You must be told if information in your file has been used against you.
- You have the right to know what is in your file.
- You have the right to ask for a credit score.
- You have the right to dispute incomplete or inaccurate information.
- Consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information.
- Consumer reporting agencies may not report outdated negative information.
- Access to your file is limited.
- You must give your consent for reports to be provided to employers.
- You may limit "prescreened" offers of credit and insurance you get based on information in your credit report.
- You have a right to place a "security freeze" on your credit report, which will prohibit a consumer reporting agency from releasing information in your credit report without your express authorization.
- You may seek damages from violators.
- Identity theft victims and active duty military personnel have additional rights.